UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL CASE NO. |
| | : | 3:10-cr-250 (JCH) |
| v. | : | |
| | : | |
| RUFINO CANDELARIO, | : | JULY 3, 2012 |
| Defendant. | : | |

**RULING RE: DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL (DOC. NO. 788)**

**I.     INTRODUCTION**

On March 20, 2012, a jury found the defendant, Rufino Candelario, guilty on one count of Possession with Intent to Distribute 500 Grams or More of a Mixture and Substance Containing a Detectable Amount of Cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(ii). Candelario now moves for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. Def.'s Mot. J. Acquittal (Doc. No. 788). For the following reasons, the Motion is denied.

**II.    BACKGROUND**

The Superseding Indictment in this case charged Candelario and twenty-five others with various drug offenses. Superseding Indictment (Doc. No. 61). Specifically, Count Five of the Superseding Indictment charged Candelario and Manuel Vizcarrando with knowingly and intentionally possessing with the intent to distribute 500 grams or more of cocaine. Id. ¶ 7. Candelario was convicted by a jury following a two-day trial. Jury Verdict (Doc. No. 747).

At trial, government fact witnesses Karl Jacobson, a Task Force Officer with the Federal Bureau of Investigation's Safe Streets Task Force ("Officer Jacobson"), and Carlos Conceicao, a member of the New Haven Police Department's Street Interdiction

Unit ("Officer Conceicao"), testified to the following: On December 18, 2010, four federal agents and seven New Haven police officers ("the officers") executed a search warrant for 150 Kendall Street, an auto repair shop in New Haven, Connecticut ("the garage"). Trial Transcript (Doc. No. 962-1) ("Tr.") at 7: 17-20, 8: 1-2, 10: 1-4. On the basis of previous surveillance, controlled purchases, and wiretap intercepts, the officers believed the garage was a hub of activity for a group of local drug traffickers. Id. at 5: 21-25, 6: 1-5. The garage was owned by Manuel Vizcarrando, id. at 7: 2-4, and the officers had a warrant for Vizcarrando's arrest, id. at 12: 20-23.

When the officers arrived at the garage, an elderly female, another female, and some children were waiting outside in or near a blue pick-up truck. Id. at 12: 11-16. They were later identified as Candelario's family members, including his wife. Id. at 14: 23-25.

Inside the garage, the officers found a Jeep Cherokee ("the Jeep"). Id. at 15: 4-11. Officer Jacobson first observed Candelario walking from a point near the side of the Jeep toward the garage exit. Id. at 35: 14-21. Officer Jacobson also observed Vizcarrando working under the hood of the Jeep. Id. at 15: 7-20. Officer Jacobson secured Vizcarrando and brought him to an adjoining office area for questioning. Id. at 16: 5-16. Candelario was secured outside the garage. Id. at 70: 1-8.

Officer Jacobson questioned Vizcarrando about narcotics in the garage. Tr. at 16: 22-25, 17: 1-4. Officer Jacobson then searched the office and recovered eighteen small bags of cocaine, each worth about twenty dollars. Id. at 17: 5-9.

Candelario was subsequently escorted back into the garage and searched. Id. at 17: 14-24. The officers found three small bags of cocaine in his pocket that appeared to

match the bags found in Vizcarrando's office. Id. at 18: 1-6. At this point, Officer Jacobson informed Candelario that he was under arrest. Id. at 18: 7-16.

Candelario told the officers that the Jeep belonged to him.[1] Tr. at 18: 25, 19: 1-2. He appeared extremely nervous, id. at 19: 15-19, and asked seven or eight times if his wife could "take the car," id. at 20: 8-13.

At around this time, Officer Conceicao began searching the Jeep. Id. at 71: 8-16. In the rear cargo area, Officer Conceicao discovered four individually wrapped kilograms of cocaine inside an open-topped shopping bag. Id. at 72: 1-11, 75: 8-20. When Candelario learned that the drugs had been discovered, he told Officer Jacobson that his wife "didn't know anything about it." Id. at 23: 6-14.

A government pen register and Candelario's phone records revealed that Candelario had contacted Vizcarrando approximately three hundred times over a period spanning from July 2010 to December 2010. Tr. at 64: 11-25, 65: 1-9. Candelario had also made calls to Nicholas Casanova-DeJesus and Ceferino Quinones, who were both subjects of the government investigation that led to the search of the garage. Id. at 64: 11-20.

The government's expert witness, Special Agent Robert Bornstein ("SA Bornstein"), testified that the four kilograms of cocaine found in Candelario's Jeep were between 69.3 and 80.7 percent pure. Id. at 89: 12-18. According to SA Bornstein, these purity levels were higher than would typically be found in cocaine purchased for personal use. Id. at 89: 20-25, 90: 1-3, 90: 13-18. SA Bornstein also testified that the typical quantity of cocaine purchased for personal use would be 1 or 3.5 grams. Id. at

---

[1] At trial, Candelario stipulated to his ownership of the Jeep.

90: 4-10. Finally, SA Bornstein testified that a kilogram of cocaine that was more than 70 percent pure could sell for as much as thirty-five thousand dollars. Id. at 92: 8-12.

## III. LEGAL STANDARD

Rule 29(a) of the Federal Rules of Criminal Procedure provides, in relevant part that, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Upon a motion pursuant to Rule 29(a), "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also United States v. Peyton, 159 F.3d 49, 56 (2d Cir. 1998) ("The ultimate question is not whether we believe the evidence adduced at trial established the defendant's guilt beyond a reasonable doubt, but whether any rational trier of fact could so find." (emphasis in original)).

A defendant challenging the sufficiency of the evidence on a motion for a judgment of acquittal "bears a very heavy burden." United States v. Gonzalez, 110 F.3d 936, 940 (2d Cir. 1997) (internal quotation marks and citation omitted). The evidence must be viewed in the light most favorable to the government, and all inferences must be drawn in the government's favor. United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000). The "government need not negate every theory of innocence." Id. The jury may properly reach its verdict based upon inferences drawn from circumstantial evidence, and pieces of evidence must be viewed in conjunction, not isolation. See United States v. Mariani, 725 F.2d 862, 865-66 (2d Cir. 1984).

**IV.    DISCUSSION**

Candelario argues that, based on the evidence presented by the government, the jury could not reasonably find that he (1) had constructive possession of the drugs found in his Jeep, or (2) had an intent to distribute those drugs. The court rejects both contentions.

   A.    Constructive Possession

"Constructive possession exists when a person . . . knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." United States v. Paulino, 445 F.3d 211, 222 (2d Cir. 2006) (internal quotation marks and citations omitted). The control need not be exclusive. United States v. Snow, 462 F.3d 55, 69 (2d Cir. 2006). "Mere presence at the location of contraband does not establish possession." Id. However, "presence under a particular set of circumstances from which a reasonable jury could conclude that the defendant constructively possessed contraband located there [can] support a conviction." Id.

The court finds that Candelario was present at 150 Kendall Street under a set of circumstances from which the jury could reasonably conclude that he constructively possessed the four kilograms of cocaine found there. Certainly Candelario's extreme nervousness and repeated requests that the officers let his wife "take the car" suggest that he knew there were drugs in the back of his Jeep.[2] See, e.g., United States v. Tran, 519 F.3d 98, 104-05 (2d Cir. 2009) (finding sufficient evidence to support

---

[2] Candelario points out that "[t]here is no evidence specifically enumerating the Jeep as the car [he] was referring to when he made the requests." Def.'s Mot. J. Acquittal at 2. However, Officer Jacobson testified that, before making the requests, Candelario told the officers that the Jeep belonged to him. Tr. at 18: 23-25, 19: 1-2. He further testified that Candelario was standing next to the Jeep when he made the requests. Id. at 18: 18-22. Candelario's wife, meanwhile, was outside the garage, standing next to a truck. Id. at 12: 11-16. Given this context, it was entirely reasonable for the jury to interpret Candelario's requests that his wife be allowed to take "the car" as requests that his wife be allowed to take the Jeep.

5

possession conviction where evidence of the defendant's presence was supplemented by evidence of his nervousness and suspicious statements to police). The large quantity of cocaine involved also supports an inference that Candelario was aware of the drugs. See United States v. Serrano-Lopez, 366 F.3d 628, 635 (8th Cir. 2004) ("The large quantity of drugs involved is evidence of the defendants' knowledge . . . . [I]t is unlikely that the owner [of the drugs] would place approximately $130,000 worth of cocaine in the hands of people who do not even know it is there."). Finally, the jury could reasonably conclude that Candelario's statement that his wife "didn't know anything about [the cocaine found in the Jeep]," Tr. at 23: 6-14, amounted to an implicit admission that he did know about the drugs.

Candelario argues that, even if he is presumed to have knowledge of the cocaine in the Jeep, the record does not support a finding that he sought to exercise control over that cocaine. Def.'s Mot. J. Acquittal at 5-6. He suggests that someone else might have placed the cocaine in the Jeep simply to "secret it (as a closet, chest, drawer, or container in which to keep the drugs)." Id. at 5. However, as the government points out, the garage featured a number of storage areas "that would have served as more effective places to conceal valuable drugs than the open rear cargo area of an SUV." Gov't's Mem. Opp'n (Doc. No. 962) at 7. Thus, the jury could reasonably conclude the placement of the cocaine in the rear cargo area of the Jeep evinced an intent to transport, rather than simply store or conceal, the drugs.

A reasonable jury could further conclude that the cocaine in the Jeep was to be transported by Candelario. Such a conclusion is supported not only by the evidence that Candelario owned the Jeep and was standing near the Jeep at the time the officers

6

arrived, but also by other circumstantial evidence linking him to the drug-distribution activities at the garage (e.g., the hundreds of phone calls made to Vizcarrando over a period of fewer than six months; the phone calls made to suspected drug traffickers Nicholas Casanova-DeJesus and Ceferino Quinones; the cocaine found in Candelario's pocket that appeared to match the cocaine found in Vizcarrando's office).

Finally, Candelario's repeated requests for his wife to "take the car" could reasonably be interpreted as attempts to have his wife transport the cocaine from the scene before the police discovered it. In other words, the requests could fairly be read as efforts to exercise dominion or control over the cocaine through an agent.[3] See Paulino, 445 F.3d at 222 ("Constructive possession exists when a person . . . knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." (emphasis added)); United States v. Hernandez, 290 F.2d 86, 90 (2d Cir. 1961) ("Physical custody by an employee or agent whom one dominates, or whose actions one can control, is sufficient to constitute . . . constructive possession by the principal.").

B. Intent to Distribute

With respect to the question of Candelario's intent to distribute the cocaine, the government presented evidence that (1) the four kilograms of cocaine were of a much higher purity than cocaine typically found on the street, and (2) a typical quantity of cocaine purchased for personal use was 1 or 3.5 grams. This is sufficient to support a finding of intent to distribute. See, e.g., United States v. Gaviria, 740 F.2d 174, 185 (2d

---

[3] Candelario's wife's knowledge of the cocaine is irrelevant. Had she been permitted to leave with the Jeep, she would have been exercising control over the drugs as Candelario's agent, wittingly or not.

7

Cir. 1984) (finding sufficient evidence of intent to distribute where the defendant possessed 681 grams of cocaine varying in purity from 51.7 to 94.2 percent).[4]

## V. CONCLUSION

For the foregoing reasons, the defendant's Motion for Judgment of Acquittal (Doc. No. 788) is denied.

**SO ORDERED.**

Dated at Bridgeport, Connecticut, this 3rd day of July, 2012.

       /s/ Janet C. Hall
Janet C. Hall
United States District Judge

---

[4] The court notes that Count Five of the Superseding Indictment charged Candelario as both a principal offender and an aider and abettor. See Superseding Indictment ¶ 7 (charging Candelario under 21 U.S.C. § 841(a)(1) and (b)(1)(B)(ii) and 18 U.S.C. § 2). Thus, a conviction would be proper even if the jury concluded that Candelario never intended to transport the cocaine himself but that he knowingly agreed to let someone else use his car to transport the drugs.